and we move to the fifth case this morning, Turner v. City of Champaign. I lost Mr. Henderson. Mr. Henderson, you may proceed. Good morning, Your Honors. Your Honors, there were three distinct and plain errors made by the district court in entering a summary judgment in favor of the non-movement. As you know, this case involves a homeless man who lost his life in context with an interaction with the police on November 16th. Mr. Henderson, you might adjust your camera. We can't see the top of your head. There we go. Thank you. Thank you. The first error, Your Honor, reflects the core of the plaintiff's case, which is on the second page of the district court's opinion. It's in a footnote, footnote number three. That is the core of the plaintiff's case. Again, the second page of the district court's opinion in a footnote, page three. I'm sorry, page two of the footnote number three. Mr. Turner died in November of 2016. In April of 2016, the exact same incident happened that involved Sergeant Frost. And so what the district court does on page two in footnote three, it says Sergeant Frost encountered Turner in a similar incident in April 2016. Sergeant Frost described Turner's November 2016 behavior as a mirror image of Turner's April 2016 behavior. So in other words, the district court includes, but in a footnote, not in this analysis, that the exact same thing happened with Mr. Turner in April of 2016 as happened in November of 2016. Mr. Anderson, can I ask you a question? So they had called for an ambulance so that they could do an involuntary. And he was, you know, he was fleeing. I mean, maybe not running, but he was walking away. He's going down the alley. If not by seizing him, I mean, grabbing him by the shoulder, you know, you suggest that they should have done nothing. You know that he was he was harmless. He wasn't a threat to anyone. So they should have done nothing. How were they supposed to immobilize him so that they could get him into the ambulance when it arrived? Well, we're not suggesting that they should have done nothing. What we're suggesting is that three officers didn't need to wind up on top of him, in effect, suffocating him. That's what we're suggesting. So are you not challenging the initial stop? Because as I took it, you were challenging making an excessive force allegation kind of by stages that he shouldn't have grabbed him. And then they shouldn't have had him down on the ground. And then they shouldn't have put him in. So the excessive force starts in stages. And the grabbing of the shoulder is probably what starts it. But then it gets worse. And so it's okay for them to call the ambulance. That's not the issue. Is it okay for them to grab the shoulder? Probably, yes. However, what it's not okay to do at that point in time is to jump on top of him, have three officers on top of him, put his hands behind his back, put handcuffs on him, and literally have the weight of three officers on top of him. But what about when his arms are flailing back and forth and it pops the thing off of the officer's shirt? So putting it in the context of the totality of the circumstances, this is a man who has mental health issues, and they know that going in. They have dealt with him for a period of two years prior to this November of 2016 incident. So they took him to the hospital about 12 times between November of — What should they have done, Mr. Henderson? My question is, what should they have done? So, you know, they stop, and he resists. He won't stop. And he's, you know, moving and pushing back. They're trying to get control, and they can't. What should they have done? They should have, one, waited for the ambulance that they called. Number two, they should have just continued to walk with him. Number three, it's not only what they should have done, what they shouldn't have done. They shouldn't have jumped on top of him, which they knew would have been problematic. So just wait for the ambulance. Why did they not — I'm sorry. Go ahead. Go ahead, Judge Kenney. This was an unusual situation, as they described it. It wasn't the way he normally acted, even though he acted very strange earlier. This was violent. It's just the opposite, Your Honor. It was not an unusual situation because, again, if you look at footnote number three, what the district court says was what happened in November of 2016 was the exact same thing that happened in April 2016. They say Richie Turner's behavior didn't change. What changed was the officer's. So if you look at what the district court — But there are 11 occasions. I'm sorry? There are 11 occasions of him going to the hospital. Yes, but that supports our point. If you're going to make the analysis in the context of what supports the non-moving party, over a period of two years, 12 different times, they took him to the hospital safely. They managed to do it approximately 12 times over a two-year period, which the district court never addresses in its opinion. The district court doesn't start addressing its opinion until the day of the incident, completely ignoring the fact that there was a mirror image incident six months earlier and completely ignoring the fact, in its opinion, that they took this man safely to the hospital over a period of 24 months. That's nowhere discussed, analyzed, or considered in the district court's opinion. The district court goes straight to the day of the incident. So, therefore, what the district court has done is it has not reviewed the matter in the context of the totality of the circumstances. It has not reviewed the November 2016 incident in contrast with the April 2016 incident. Clearly, the question is a pretty simple one. If the police managed to get him to the hospital in April of 2016 and Richie Turney's behavior didn't change, then what happened in November of 2016 when three officers wound up on top of him and he wound up dead? And the answer from the plaintiff's perspective is it wasn't Richie Turney who changed. It was the officers who changed. The officers handled the situation properly in April of 2016, and in November of 2016, they went overboard and they wound up on top of him. And so what we're asking you to do is, when you consider the facts and do your own analysis, the first thing we're asking you to do, in your opinion, is to do a compare and contrast between the April 2016 incident and the November 2016 incident. When you do those two things, clearly the non-movement loses. I'm sorry, the movement loses because if the police were able to safely get him to the hospital in April of 2016 and there were no changes by Mr. Turner, the changes then followed because the police did something different. What the police did different on that day was there was a rookie officer involved. That's undisputed. There was a field training officer who was sitting in his car who really was kind of disengaged. That's undisputed. There was a sergeant who was supposed to be there that particular day. He wasn't there. He was AWOL. They never did figure out where he was. And then the sergeant who actually did show up came from another part of town. That was Sergeant Frost, who comes clearly across town and gets involved at the last minute. So, again, if you're going to look at the matter in favor of the party as the law requires, looking at it in favor of the non-movement, the first question we're asking you to do is analyze and discuss April 2016 to November 2016. That's the first thing that we're asking you to look at. The district court never does that. The second thing that we're asking you to do, which the district court failed to do, was analyze the November 2016 incident in the context of those other 10 or 11, 12 cases where they were able to get him to the hospital safely over a 24-month period of time. They knew this guy. He's not a stranger to them. Some of us may remember the Andy Griffith Mayberry show where there was Otis the Drunk. Otis the Drunk walked himself into the jail every day. He took the keys. He walked in. They knew him. He's not a stranger to them. Any of the cases that have been cited by the district court or the defendant, this in all practical purposes is Otis the Drunk. They know him. They had a lot of interaction with him. They know he's harmless. On the day of the incident, there's no gun. There's no knife. He didn't threaten anybody. He wasn't doing anything other than having a mental illness seizure, which is why they called it. So there was no compelling government interest on this particular day to seize him. That doesn't exist. He didn't harm anyone. He didn't hurt anyone. He wasn't threatening anyone. He hadn't committed a felony. He hadn't done anything wrong. The only thing that he was guilty of – I'm sorry, Your Honor. Sorry. I know you're on a roll, but I need to ask you a question here. Yes. Your expert agreed that there was sufficient basis, probable cause, to commit Mr. Turner involuntarily, correct? Yes. So that, as I understand the law, carries with it constitutional authorization to use force reasonably needed to effect that action. Yes. And that includes overcoming force or resistance by the subject, correct? Well, what I would add to that is if you're dealing with somebody who's mentally ill versus dealing with somebody who's sane, A. B, if you know – if you've interacted with this person over an extended period of time and you know them to be harmless, you know that they have no weapon. In that particular situation, the amount of force that was necessary is probably the same level of force that was necessary in April of 2016 when they safely got him to the hospital. It was the same level of force that was necessary in the other 10 or 11 incidents when they safely got him to the hospital. So if this had happened, are you telling us that if the fatal result had been what happened the first time the police encountered Mr. Turner, it would be constitutional? Your Honor, I don't know. I don't have facts for the first time what happened. And what I know is that what Sergeant Frost said is that it was the exact same thing by Ritchie Turner. Those are Sergeant Frost's words. Those are his words. So he was there. He said it was the exact same thing. He said that Ritchie Turner did the same thing. And what the family is saying, what the Turner family is saying, what changed is the police. It wasn't Ritchie Turner. Those are the facts. Those are the undisputed facts that come from Sergeant Frost. He said in April 2016 in footnote 4 that Ritchie Turner's behavior was a mere incident of what happened in November 2016. And if you're going to look at it and analyze a motion for some judgment in the context of what's most favorable for the non-movement, then the question is, well, what changed? And the answer to what changed is the police changed. They went overboard on that particular day and they had safely gotten this man to the hospital 12 times previously. So you have 12 incidents where he's safe and one incident where he loses his life. If you analyze the motion in that context, clearly this is enough to get past the motion for summary judgment because at that point in time the officer's credibility is on the line. By definition, you're emphasizing a lot that the police knew Ritchie, but by definition, the rookie officer didn't have that long experience with Ritchie, correct? That's not correct. The rookie officer did have some familiarity with Ritchie Turner, so he knew he was A. B, his field training officer was right there with him. So three, the mandates of the training and you have a rookie who's being trained, say, hey, when you're approaching a mentally ill person, you know, kind of step back a little bit. Don't escalate the situation. De-escalate it. And so what the officer did on that particular day, the starting of the escalation was when he grabs his shoulder. But again, this is not someone who's committing a crime. This is somebody who's mentally ill who probably doesn't know, really know what's going on at the time. And so then he moves away. And then from there, you have three officers who wind up on top of him with his face to the ground, stomach on the concrete, hands behind his back, handcuffs on his hands. They pull a hobble out and he's literally struggling to breathe because you have an officer who's Officer Wilson, the rookie officer, saying it's very likely that he was struggling to breathe. He's not resisting. He's fighting for his life. And if you analyze this particular motion that was filed by the city against the earlier incident, which was a mere incident A, and if you analyze it in the context of the 24 incidents or the 12 incidents that happened over 24 months, your honors, with all due respect, I don't think there's any way that this motion for summary judgment gets granted. And then the last thing that I would say, when you are looking at the incident on that particular day, there is no compelling government interest to have three officers tackle him. He didn't shoot anybody. He didn't threaten anybody. He didn't rob anybody. They knew on that day that he had mental health issues. And all we're saying is what they should have done on this 13th day is the same thing that they did the prior 12 times is wait for the ambulance, let it play itself out. You'll get them into the ambulance and get them to the hospital safely, just like they did prior 12 times. What changed on this incident, your honors, was the rookie officer, the aggressiveness, the field training officer not being on top of things, the sergeant who was assigned to that area not being there. And then it just was a calamity of errors which resulted in excessive force to a man who lost his life. Yes, he was mentally ill. Yes, he was homeless, but he was part of that town. Again, no different than the drunk on Andy Griffith. He did not have to die. I reserve the rest of my time. Thank you. Thank you. Thank you. May it please the court and counsel. My name is Justin Bruner on behalf of the city and the individual defendant officers. I think that appellants argument comes down to position that the officers should have used less force to get Mr. Turner into an ambulance here because they were successful in doing so on prior occasions. And the fact of the matter is that just because he did not struggle or react violently in prior circumstances, six months, a year, a year and a half, two years earlier, does not dictate whether he struggled or reacted violently in this case, and how officers could react. This principle has been recognized, even recently in the king decision. The record here is undisputed that in a split second or matter of seconds after an officer touched Mr. Turner's shoulder, he shoved an officer flailed his arms, knocked off a radio from his chest, reached into the vicinity of another officer's belt that held a firearm and was struggling against officers to the point that two of them could not even control him enough to get him handcuffed. Now, there's a bit of a misapprehension in the record, whenever the estate says that this was a quote mirror incident. While that term was used in a deposition, it was to describe Mr. Turner's agitation basically at the beginning of the encounter whenever Sergeant Frost first saw him. Sergeant Frost made the point as reflected on page 26 of our brief with citations that Mr. Turner did react differently here. He did not remain seated on a sidewalk as requested. He did not run in the earlier quote mirror incident. And here in that earlier incident officers did not have to follow him into the alley as they had done here. Here, an ambulance was staged nearby officers were trying to get him committed for his health, his mental health, and these, their success on prior occasions, does not create a jury issue on this particular occasion. I want to jump to the issue of what the expert witness said. So, I'll get back to it but the issue is they've not been able to produce any direct or circumstantial evidence of excessive force. So, the estate is relying heavily upon their expert witness. He doesn't offer anything material. Rather than criticizing specific uses of force, he claims that officers should have deescalated the situation via some mental health crisis intervention. And really this amounts to a repackaging of the provocation rule that the Supreme Court has unanimously rejected. And there's other Seventh Circuit case law noted on this issue in our brief. But at the end of the day, the question is not whether the officers should have done something better or employed some better technique prior to seizing Mr. Turner in order to avoid his flight. But whether once they made the decision to seize him they had a basis to do so. Here, I believe as the estate has conceded an argument, there was probable cause to seize Mr. Turner for a mental health evaluation. I'm not going to get into all the facts but he was flailing his arms, speaking unintelligibly, acting abnormally. It's apparent on the video and from the deposition testimony. Backing up just a bit, I think that the state hasn't pointed to it as much today but they've argued in the past that they have not had the opportunity to challenge the officer's testimony about Mr. Turner's resistance or his behaviors and that's not really the case. They had an opportunity to develop direct evidence if they were able to. There were other people you can see in the video in the area. This is not an isolated location where this occurred. Discovery revealed the names of other possible witnesses. We don't know if the state tried to locate and interview them. We do know that they did not present any deposition testimony or affidavits from anyone to directly contradict what the officer's sworn testimony says about what occurred in that alley. And even short of direct evidence, if the estate could not have come up with someone to counter the officer's point for point, they had an opportunity to present circumstantial evidence. This is important here. There's a potential that physical evidence could have disputed the officer's testimony that they used a minimal amount of force. If there was excessive force, that tends to leave behind some kind of trauma. Here it's absolutely undisputed that the officers left no trauma. He was examined by paramedics on the way to the hospital, emergency room doctor, deputy coroner, and a forensic pathologist. None of those qualified individuals observed any circumstantial evidence that the officer's use of force inflicted a crushing or beating injury to Mr. Turner's head, neck, chest, or internal structures. There's no broken neck cartilage, no internal hemorrhaging, no broken ribs, no collapsed lung. If the estate wanted to dispute that evidence was in the record, they certainly could have gotten an expert to present on the circumstantial evidence and come up with a contrary opinion. And that could have, through that circumstantial evidence or combination with direct evidence, whatever, they could have come up with some form of a dispute with the officer's sworn testimony. It's not enough to say that the testimony can just be rejected out of hand because the jurors should get to decide whether they believe the officers or not. There has to be something to send this case to the jury in the first place. And there's an indication in the briefs that because the video doesn't capture every bit of the sequence, somehow the sworn deposition testimony and affidavits are not enough to send this through summary judgment. This court has never held that excessive force cases must always go to a jury unless the incident is wholly captured on video. Obviously, that kind of rule would relieve the plaintiff of any burden to prove excessive force. And cases have been decided for decades and longer than that on the basis of sworn deposition testimony and affidavits without a video. And it's not just unique to excessive force cases. There's all kind of issues that come before Your Honor that are decided in that way without video. So when we really get down to it, the key issue is not what led up to the things leading up to the touch in the walkway are part of the totality of circumstances, at least according to some of the Seventh Circuit case law. I think the Supreme Court has deferred deciding that issue until more squarely presented. But once you get into the alley, the question is, is there a probable cause to seize Mr. Turner for a mental health evaluation? We would submit that there is. The facts, again, were largely undisputed, and that was a big part of the Supreme or the district court's decision. We presented 100 plus numbered paragraphs of allegedly undisputed facts, and the state did not counter almost any of them. There were, I think, eight that were claimed that our characterizations were incorrect, suggesting that maybe Mr. Turner did not act intentionally at a particular point in the interaction, but that's not material. As your honors know, and I think is as repeated several times in the dockery case, I believe it is. This is about what officers could have reasonably perceived on the circumstance, not whether Mr. And refusing to comply. So when you get past the basis for the seizure, the probable cause for mental health seizure, then we look at each of the parts of the encounter. Was the touch on the shoulder objectively reasonable? Yes. I'm not going to spend any more time on it because even plaintiff's expert concedes that it was objectively reasonable. Not that his testimony on that point is determinative, but perhaps a sign of where the issues are here. Again, was it objectively reasonable to put Mr. Turner into a prone position? We have to think about what was happening there. The Seventh Circuit has laid out hallmarks of active resistance, several of which were present here. Mr. Turner was flailing. He was declining to follow instructions while acting in a belligerent manner. He was swatting and arresting officers hands away while backpedaling. These things, even when a person is known to have a mental illness, permit the officers to review this as resistance and to react accordingly. And the reaction is also important. Placing Mr. Turner into a prone position so that he could be handcuffed whenever officers were unable to control him to handcuff them in an upright position is reasonable. They did not bludgeon him over the head to make him collapse into a prone position. No one tackled him. I think sometimes in the heat of argument, words get used about tackling and jumping on Mr. Turner. Three officers jumping on him. That's not what happened. Two officers had his arms. They move him onto his stomach in a prone position. Once he's there, the question is, is it objectively reasonable to use a knee with just enough pressure to try to get him controlled and handcuffed? Really, what you look at is, again, that circumstantial evidence. There's no evidence of the internal bleeding, hemorrhaging, breaks, collapsed lungs, etc. The kind of things that push the court in the Abdullahi case to decide that there was at least an issue of fact for the jury to decide. The final use of force was Officer Talbot joining the group and controlling Mr. Turner's legs or attempting to do so so that a hobble could be applied. And even there, it's telling that the first attempt to put on the hobble was unsuccessful as Mr. Turner continued to kick and kicked his way out of it. And officers had to do it two times. I would note that there was a there was in the briefing and today a mention of Officer Wilson, and I'm not sure exactly what the terms were. But Officer Wilson allegedly admitting that Mr. Turner was unable to breathe, and that's why he was struggling on the ground. It's not what the record says. There was a question to Mr. To Officer Wilson about when you were on the ground with Mr. Turner, could he have been struggling because he was having difficulty breathing? There was an objection on foundation and Officer Wilson said he could have. I don't know. That's not impressive testimony. It's not enough to create a genuine dispute about whether Mr. Turner was resisting as he was struggling on the ground, particularly in light of all these hallmarks and the fact that this is an objective analysis. Anyways, not a subjective analysis of whether Officer Wilson thought he could have been having trouble breathing at that point. At the as my time is drying short, I want to talk a little bit about qualified immunity and not just qualified immunity, but the repeated assessment that officers split second decisions in these tense, rapidly evolving circumstances. Are not to be sorry. I was trying to tell if the clerk sending me a message about something. Okay. These split second decisions are not to be second guessed with the hindsight of 2020 vision sitting in the chambers detached from the scene. And although there's some statements in the Estates briefing about how we don't they don't need to present a case that's on all fours. They do have to do better than they've submitted here. The Supreme Court after some of those seventh circuit pronouncements about not needing a case on all fours said that the question really needs to be quote beyond debate or an obvious case here given all the cases cited in our briefing. This is just not one of those situations was neither obvious nor beyond debate that any reasonable officer in this position would have understood that he was violating the Fourth Amendment by seizing Mr. Turner with non crushing non beating force to effectuate a mental health involuntary commitment. Briefly, the, the causation issue, Mr. I'm sorry, the estate argued today that the issue is, I believe, the state's words were that officers were suffocating him. There's no evidence of that in the record. The record indicates Mr. Turner had a cardiac arrhythmia that he had substantial pre existing conditions, and there was no expert evidence submitted by the state in order to rule out pre existing conditions and indicate that the force used here was what caused the injury. In fact, one of the bits taken from the deposition testimony, and that was stated in our statement of facts was that the force did not cause Mr. Turner's death and that was left undisputed by the estate and its response to our summary judgment in the district court below. Similarly, there's, there's comments about whether the stress of this interaction caused his death. And again, those were left undisputed that while in a textbook format, the stress of this interaction could have caused his death, the forensic pathologist was unable to say that in this case, that was what happened. The end of the day, your honors. I apologize. Well, at the end of the day, we have a situation where an individual is in need of help, as he had been many times before the Champaign Police Department answered that non emergency call to attempt to provide community police protection services for him. They tried to reason with him. That was unsuccessful. They tried to use minimal force to stop him. That was unsuccessful. And whenever he reacted in a struggle that could be characterized as violent, they used a reasonable amount of force without crushing beating him or gratuitously gratuitously causing any injury. Thank you. Henderson. Your honor, I reserved five minutes I think the 40 seconds is from before I reserved five minutes. That's the full time. No, I don't think so. Go ahead and we'll see where you go, but you have only 40 seconds. Okay, your honor, just procedurally again, I asked for 10 minutes up front and five on the back end, but I will proceed. I'm sorry, this is the clerk. Yeah, you were given 15 minutes up at the beginning of the clock. So this is the full 15 minutes. Okay, well, I asked for 10 and to reserve. You're going to have to go with now. Your honor, a couple of things. Number one, your honors, there's a report from the coroner, Dr. Bauer, which says that the struggle, the mental and physical struggle triggered the death of Richie Turner. That's in the that's in the record. Number two, you would expect that the law cannot be, your honors, that anytime there is a police report that's filled out after someone dies and police officers tester after someone dies. And if there's a dead person who's not around to testify about what happened, that the police always prevail, that that is not the law, and that cannot be the law. That's what transpired in this case. Your honor, I'd ask for an additional two minutes. No, that's fine. Thank you very much. Thank you, your honors. Thanks to both counsel and the case is taken under advice.